[Civ. No. 7134. First Appellate District, Division One.—July 10, 1930.]

STEPHEN G. LANGFORD, Respondent, v. ERICH KOSTERLITZ, Appellant.

Ford & Johnson for Appellant.

William Kehoe for Respondent.

DEASY, J., *pro tem.*—Respondent, for some time prior to the seventh day of December, 1926, had suffered from asthma. He had been treated from time to time by many doctors, but had obtained only temporary relief. Some few months prior to said date an operation had been performed on respondent's nose by a Doctor Martin, in which part of

the middle turbinate bone and also some infected ethmoid cells had been removed. On said date, respondent called on appellant, and after stating his condition and the facts about the operation as he knew them, was examined by appellant and employed appellant as a physician to perform an operation, suggested by the latter, which consisted of injecting alcohol and novocaine into the spheno-palatine ganglion or nasal ganglion, for the purpose of killing the nerves and relieving the trouble. In the evening of that day the operation was performed, and according to respondent's claim, appellant negligently pushed a hypodermic needle through the bony structure between his right nostril and his right orbit, and injected alcohol and novocaine into the orbit, causing an atrophy of the optic nerve and destroying entirely the sight of his right eye. Respondent brought this action against appellant to recover the sum of $25,000 for said alleged negligence. A trial was subsequently had before the court sitting with a jury, and at the conclusion thereof the jury brought in a verdict in respondent's favor for the sum of $15,000. From the judgment entered on said verdict this appeal is brought.

Appellant contends first that respondent failed to prove the charge of negligence alleged in the complaint. After alleging the matters of inducement leading up to and including the employment of appellant, as stated in the opening paragraph of this opinion, the complaint alleges in paragraph III as follows:

"That thereafter and on said 7th day of December, defendant attempted to kill said nerve; that for that purpose he ran a metal instrument up plaintiff's right nostril penetrating the lining thereof and thereupon by and through the use of hypodermic needle injected a solution consisting, as plaintiff is informed and believes and therefore alleges upon information and belief, of alcohol and novocaine, into the punctured side of said nostril; that the said acts were so negligently, and unskillfully done and performed by defendant that as an immediate and proximate result thereof the optic nerve running to plaintiff's right eye was killed and as a proximate result of said killing of said optic nerve the sight in plaintiff's right eye was completely and permanently destroyed and the asthma suffered by plaintiff was

not affected or cured by said operation and the said sphenopalatine ganglion was not killed.''

Respondent testified that he called at appellant's office on the afternoon of December 7, 1926, and stated to him all of the facts as to his condition, including the treatment by other doctors and the operation by Dr. Martin. That thereupon appellant told him that he could absolutely cure his condition; that he had a simple operation that he performed on asthma cases that only took a few minutes, and would absolutely cure them without any question at all; that if respondent submitted to that operation he would be cured immediately. That appellant asked respondent if he would care to have him do it right then, but that respondent said he would like time to consider it until the evening. Respondent also told appellant that he thought it would be a good idea for appellant to call up Dr. Martin and ask him just what he had done. That appellant said it would be a good idea, but that he did not do so. That the only examination appellant made at that time was to look up respondent's nostrils. That they then made an appointment for 7:30 o'clock that same evening. That when respondent reached appellant's office in the evening the first thing appellant proceeded to do was to spray the inside of both of respondent's nostrils, with what he said was cocaine, one side at a time; he said he wanted to determine whether it was the right or left side that was causing the trouble, and after he had sprayed the nostrils he said it was on the right side that he wanted to kill the nerve. He said he was going to use alcohol hypodermically to kill the nerve, and then began his operation. Respondent also testified substantially as follows:

"He began by taking a metal tube four or five inches long and inserting it up the right nostril and forcing it up into my head through the wall of the nostril. I could feel and hear it crushing through the bone up in there. After he got that in there he immediately picked up this hypodermic needle that he already had loaded, and inserted it through this tube and injected the solution which he told me was alcohol and novocaine in there. And instantly I had a sensation of a spark in that eye, and that was the end of my sight. I have never seen anything more in that eye from then on. . . . As soon as he injected the alcohol, he removed his

instruments and led me over to a couch and let me lie down on it, and try to recover. I was pretty badly shaken up from this thing. It was extremely painful, and the effect of the thing nearly knocked me out temporarily. He immediately discovered that I could not see anything with that eye, and he was attempting to see what I could see with that eye by holding lights up and moving them in different directions. And he told me at that time that it was all right, there wasn't anything the matter, except that perhaps, I think he called it hematoma. He explained that that meant a formation of blood or blood clot against the optic nerve which would temporarily blind me, but would soon dissolve and would be all right in a day or so. He telephoned to some other doctor, and was in quite an excited frame of mind at the time, and was talking to him in a foreign language, so I don't know what he told him.''

Respondent further testified that he next saw appellant the following evening at the doctor's office, and that his wife was with him at the time. That on that occasion appellant made the following statement:

''He explained to both my wife and myself that he injected a solution of alcohol and novocaine in this eye, and that that was different than he had ever done before in a similar case; that always before that he had injected novocaine first and alcohol afterwards; and that he saw now from the result that that was absolutely wrong, and that had he injected novocaine first and had put this novocaine into my optic nerve, it would have temporarily blinded me, but it would have indicated to him that he was in the wrong place, and he would not have followed it up with alcohol; that having done it this way for the first time, he saw that it was wrong, and he would never do it again that way.''

Appellant denied in his testimony substantially all of the matters testified to by respondent and his wife, and testified that he inserted the solution drop by drop and urged respondent constantly to tell him if he saw lights or felt pain. He also testified that he had performed the operation in the same manner and with the same care that he used in performing similar operations at other times. He also denied making the statements attributed to him by respondent and his wife.

Dr. Frank S. Baxter, an eye, ear, nose and throat specialist, testified on behalf of respondent. The general substance of his testimony is as follows:

"The nose is roughly, tent shaped, with two slanting side walls with a ridge pole in the center. On the side walls there are three bones called the turbinate bones, lower, middle and upper. At the back end of the middle turbinate bone lying in a cave in the bone forming that side wall, lies the nasal ganglion. Taking a person the size of plaintiff, the minimum distance between the nasal ganglion and the optic nerve leading to the right eye, would be about half an inch. Between the optic nerve and the nasal ganglion is bone, perhaps air spaces, also fatty tissue, blood vessels, arteries and nerves. In performing the operation for the purpose of killing the ganglion nerve, it is not possible in any instance for the fluid injected into the nasal passage to reach the optic nerve leading to the right eye without first penetrating or crushing the bony formation between the nasal ganglion and the optic nerve leading to the right eye. The optic nerve runs in a separate bony channel inside the skull to the right eye. There is a definite bony partition between that nerve and the nasal ganglion. The needle would have to be at or in the optic nerve for the instantaneous result of a flash and loss of sight at the injection of the fluid. A man with reasonable skill and care in his technique would so guard his every move that he would not puncture the bony partition between the nasal ganglion structures and the optic nerve."

On cross-examination Dr. Baxter testified as follows:

"Q. And that if in such case you had such an involvement, such bad results, would you feel that the surgeon who had performed the operation must have been lacking in skill or wanting in care? A. The technique of any such procedure is so exquisitely dainty that every possible precaution should be exercised not to get any such unfortunate condition as this. That means accurate measurement of needle distances, actual dosage in the amount of solution injected."

We will have occasion to refer to other portions of Dr. Baxter's testimony later on, but for the purpose of considering appellant's first point the foregoing is sufficient.

█ Appellant has called our attention to many cases in this state to the general effect that a physician or surgeon

does not guarantee a cure, and that the fact that the patient does not recover raises no presumption of negligence. That such is the law cannot be questioned. The fundamental basis for the recovery of damages is unskilfulness or negligence.

Appellant's counsel have endeavored to show, by their own construction of the testimony of Dr. Baxter, that it did not show any negligence on the part of appellant, or that he unskilfully performed the operation in respondent's nose. A careful consideration of Dr. Baxter's testimony does not bear out their conclusions. Dr. Baxter, according to the record, is a specialist in the treatment of eye, ear, nose and throat ailments. He has so specialized for many years, and has made a very thorough study of his subject. The very delicate nature of the situation presented to appellant prior to and during the operation is very apparent from the record, and indeed it is almost a matter of common knowledge that operations in the nasal cavities are such that by their very nature they require the exercise of more than the usual skill and care attendant upon operations on other parts of the body.

Negligence on the part of a physician or surgeon consists in his doing something which he should not have done, or in omitting to do something which he should have done. (*Perkins* v. *Trueblood*, 180 Cal. 437, at 443 [181 Pac. 642].)

The testimony of Dr. Baxter is clear and definite where he states that asthma may be the result of varying causes, and that in order to attempt to cure it a very careful investigation should be made. In view of the undisputed fact that appellant knew of the prior operation on respondent's nose in which portions of bone were removed, it would seem, almost as a matter of common knowledge, as well as a matter of expert testimony as stated by Dr. Baxter, that appellant should have consulted Dr. Martin in order to ascertain the exact condition of respondent's nose before going on with the operation.

There was certainly in this case a substantial conflict in the evidence as to the question of negligence and unskilfulness, and the action of the trial court in denying the motion for nonsuit was correct. Thereafter, the matter having been submitted to the jury, its finding of negligence is binding on this court and cannot be disturbed.

■ The second point urged by appellant relates to the admission of evidence by the trial court which he claims to be error. In his first specification of error in that respect appellant refers in his brief to the following evidence which he claims was given:

"Q. Now, is there any condition of asthma for which there is sometimes an operation on the nerves in the nasal passage that is recognized by the profession practicing in Oakland and vicinity? A. There is one surgical procedure which will relieve any case of asthma.

"Q. Now, Doctor, are you familiar with that surgical operation? A. Yes.

"Q. Will you please describe how and in what manner that surgical operation is performed, properly or skillfully performed by persons who are qualified to perform that operation and are practicing in the City of Oakland and vicinity?

"Mr. Bourquin: Objected to as irrelevant and immaterial.

"The Court: Overruled."

An inspection of the record discloses that the following is the testimony given by the witness on the point in question which differs materially from that just quoted.

"Q. Is there a recognized operation in Oakland vicinity upon one of the nerves in the nasal passage for the correction of asthma?

"A. That is rather a broad question. I hope that I can answer it. Asthma may be due to one of various causes. There is one procedure that will cure every case of asthma.

"Q. Now, is there any condition of asthma for which there is sometimes an operation on the nerve in the nasal passage that is recognized by the profession practicing in Oakland and vicinity?

"A. There is one surgical procedure which will relieve many cases of asthma.

"Q. Now, Doctor, are you familiar with that surgical operation? A. Yes.

"Q. Will you please describe how and in what manner that surgical operation is performed, properly and skillfully performed by persons who are qualified to perform that operation and are practicing in the City of Oakland and vicinity?

"Mr. Bourquin: Objected to as irrelevant and immaterial. "The Court: Overruled."

It is quite evident from the context and from all of the evidence given by Dr. Baxter that the word "one" in the last sentence of the first answer of the witness is a typographical mistake, and that it should be "no."

The testimony in question related directly to an operation on the nasal nerves for the cure of asthma, and the answer given to the question last quoted above, described almost identically the type of operation performed by appellant. There was no error in the admission of this evidence, nor on the rulings on the two succeeding matters referred to in appellant's second point.

The last objection of appellant on the question of error in admission of evidence relates to an entirely different matter. In order that it may appear clearly, we will quote it here in full. The record shows as follows:

"Mr. Kehoe: If your Honor please, I think before asking this question, I will submit what I expect to prove to counsel and the Court. (Hands paper to counsel.)

"Mr. Bourquin: There surely would be objection to that. It is beside the facts.

"Mr. Kehoe: If your Honor please, I will submit this to the Court.

"The Court: There is nothing before the Court yet.

"Mr. Kehoe: Very well. I wanted to show good faith.

"The Court: Ask your question and the Court will rule.

"Mr. Kehoe: Q. Will you state what, if anything, Dr. Kosterlitz said to you on Tuesday of this week in the interview you say you had with him? A. He told me that he told the representative of the insurance company that he was insured with when he came to call on him with regard to this case that he felt that I was entitled to get something for the loss of my eye, and that he would like to have the insurance company settle for more money than the amount of this policy, that he was willing to pay some of it himself, even if he had to pay $500.00 out of his own pocket."

Appellant claims that by this testimony the fact of insurance was brought before the jury to the prejudice of his case.

As a general rule the courts of this state have condemned any wilful conduct by counsel in an action for dam-

ages which would tend to bring before the jury the question of insurance. In the case of *Pierce* v. *United Gas & Elec. Co.*, 161 Cal. 188 [118 Pac. 700, 706], the court said: "Evidence that a defendant in an action for damages is insured against loss by reason thereof is not admissible, and it would undoubtedly be improper for counsel for plaintiff to endeavor to get such a fact before the jury by questions designed solely for that purpose." There the court was dealing with an assignment of error in asking the question of prospective jurors as to their ownership of stock in an insurance company. For many years after that decision, which was handed down in the year 1911, that ruling was adhered to. But in the case of *Cozad* v. *Raisch Imp. Co.*, 175 Cal. 619, at 624 [166 Pac. 1000], the Supreme Court relaxed the rule to some extent and held that a question asked of a juror known to be a friend of an agent of an indemnity company was proper when asked in good faith. Still later it has been held that prospective jurors may be asked questions as to their ownership of stock in insurance companies, provided that it is done in good faith. And again it has been repeatedly held that if a question is asked in good faith, which elicits an answer from a witness relative to insurance, that there is no misconduct. The test now generally applied to this matter is that of good faith of the counsel in the case.

In the instant case the testimony discloses that respondent's counsel wrote out the matter he expected to prove and showed it to appellant's counsel, who then said, "There surely would be objection to that. It is beside the fact."

The question was then asked by respondent's counsel, and appellant's counsel made no objection, nor did he move to strike out the answer, nor request the court to admonish the jury to disregard it. Having failed to do this at the proper time it will not avail him now. (*People* v. *Fleming*, 166 Cal. 357 [Ann. Cas. 1915B, 881, 136 Pac. 291]; *People* v. *Steelik*, 187 Cal. 361, at 377 [203 Pac. 78]; *Scott* v. *Times-Mirror Co.*, 181 Cal. 345 [12 A. L. R. 1007, 184 Pac. 672]; *Olsen* v. *Standard Oil Co.*, 188 Cal. 20 [204 Pac. 393].)

In the case of *Hughes* v. *Hartman*, 206 Cal. 199, at pages 205 and 206 [273 Pac. 560, 563], the Supreme Court, referring to a remark made by the court, said: "Conceding this remark to have been improperly made, it appears from

the record that no objection was taken to it at the time by defendant, nor was any request then or ever made of the Court to admonish the jury to disregard the same. In other words, defendant remained silent, without objection or exception to the remark as thus made, and the complaint that he was injured and prejudiced thereby is now made for the first time in this court. An exception to an improper remark made by the trial judge during the trial of an action in order to avail the party claimed to have been injured thereby must have been taken by such party at the time the remark was made, or at some time thereafter and before the close of said trial."

Also in the case of *Dullanty* v. *Smith*, 203 Cal. 621, at 625 [265 Pac. 814, 816], in referring to testimony similar to that objected to in the instant case, the court said: "The fact that this testimony contained, in addition to unobjectionable matter, references to the insurance of defendant, did not necessarily make it inadmissible for all purposes. It is true that the Court frowns upon any attempt to show that a defendant carries indemnity insurance, but where, as here, there is an entire absence of any indication whatsoever of lack of good faith on the part of plaintiff, evidence of this character, as an admission against interest, or for certain other purposes, may be received, notwithstanding the fact that it contains material which, under other circumstances, would be objectionable."

In speaking of misconduct the court said in the case of *Robinson* v. *Western States Gas etc. Co.*, 184 Cal. 401, at 407 [194 Pac. 39, 41], "Misconduct is not cause for reversal or a new trial unless it has the effect of preventing the complaining party from having a fair trial."

We have referred to the foregoing cases relating to misconduct for the reason that appellant in his briefs seems to take the ground that not only was the testimony inadmissible, but that respondent's counsel knew that it was and nevertheless insisted upon getting it in the record. We fail to see that there was anything in the conduct of respondent's counsel in this case that could, even in the remotest degree, be called unfair.

Appellant, in his closing brief, has referred us to the case of *Baroni* v. *Rosenberg*, 209 Cal. 4 [284 Pac. 1111], in which reference he says: "The Supreme Court of this State

reviewed a record containing error not unlike that found in the case at bar.'' The word ''not'' should have been omitted. A most casual reading of that case would reveal to anyone that it is entirely dissimilar to the instant case. In that case the question was directly put to the plaintiff as to whether or not he was receiving weekly indemnity from a casualty company, and during an exchange of remarks by counsel, the attorney for the defendant stated positively that plaintiff would get compensation as long as he lived. The Supreme Court held that such a statement was prejudicial error which could not be cured by any admonition of the court to the jury.

In the instant case nothing of the sort appeared.

To conclude the discussion of this matter the following statement of law by the Supreme Court of this state would seem to be decisive of the point raised. In the case of *Lahti* v. *McMenamin*, 204 Cal. 415, at 422 [268 Pac. 644, 646], the court was discussing an objection of the defendant that a reference to insurance in the evidence often influenced juries in the size of their verdicts where they are advised that the defendant has insurance to protect him against any verdict that might be rendered against him. The court then said: ''We are not disposed to dispute defendant's contention that juries are on occasions so influenced, and the rules of evidence are so framed as to exclude any direct evidence of such matters. But when the fact that the defendant carries insurance is properly brought to the attention of the jury, either by the evidence on the part of defendant, or indirectly in connection with proof of some other material fact in the case, we know of no rule of law that empowers any court to set aside the jury's verdict upon the assumption that such evidence might have influenced the jury in rendering a verdict which was excessive in amount. If the verdict of the jury is excessive, then it should be set aside by the court, no matter what may have prompted the jury in the rendition thereof. On the other hand, if the verdict of the jury is not excessive, as we have held to be the case in this action, then it should be sustained notwithstanding the fact that there is evidence in the record which might have tended to influence the jury in allowing excessive damages. The fact that the verdict is not excessive is conclusive proof that the jury were not improperly influenced by such evidence.''

Tested by the law thus stated, we feel constrained to hold that the admission of the evidence under discussion in this case was not error. ██ No claim is made anywhere in appellant's briefs that the verdict here was excessive. Had it been made we would necessarily be forced to the conclusion that such claim would be unfounded. Where, as in this case, the respondent has suffered the total loss of sight in his right eye, and all of the evidence on the subject by witnesses sworn on both' sides, demonstrates that it can never be restored, a verdict in the sum of $15,000 is very small rather than excessive.

██ The last point made by appellant is that the court erroneously gave certain instructions to the jury. As to the instructions numbered 21, 22, 28 and 35, there is no merit whatever in the objection urged. According to the rule relative to the negligence of physicians and surgeons stated in *Perkins* v. *Trueblood,* 180 Cal., at page 437 [181 Pac. 642], the appellant was negligent if he did something which he should not have done, or omitted to do something that he should have done. The question is to be determined in the light of expert testimony, and is a fact of science concerning which the mind of the ordinary lay person cannot be expected to have knowledge. The test is, what care and caution would have been used and what treatment would have been administered by physicians and surgeons possessing and exercising ordinary care and diligence in the vicinity where the act happened. This was the test applied by the court in the instructions in question.

██ Appellant next complains of instruction No. 39 upon the ground that the court at the end of the instruction used the words "whether such failure was the result of acts of omission during diagnosis and examination preparatory for such operation or by acts of omission or commission during such operation."

No claim of error in diagnosis is made in the complaint directly, but the evidence in the case shows that the entire examination by appellant and the operation occurred within a few hours of each other. The evidence in the case was directed entirely to the operation itself. And the instructions as a whole were similarly directed with the exception of the words quoted above. In view of the facts of this case, and in the light of the principles of law applicable

thereto, we conclude that the error, if error there were, was harmless and did not prejudice the appellant in any way. ▉ The last point made by appellant has reference to instructions Nos. 40, 41 and 42. The error claimed is that the court told the jury that appellant would be liable if he departed from or failed to conform to the mode or modes of treatment, or method or methods of operation established by his school of practice for the treatment of a given case or the performance of a given operation, or for experimenting in the performance of the operation in question. Appellant's claim is that he was not charged in the complaint with experimenting but with negligence. The court in the instructions in question confined the jury to the question of negligence, and it is most certainly true that an allegation of negligence is broad enough to include experimenting in the performance of such a delicate operation. The evidence of respondent and his wife was to the effect that appellant stated to them the day after the operation that he had performed it in a new way, different from the way in which he had done it before, and that he had found it to be wrong. The appellant denied this statement, but the jury, by its verdict, found against him on that matter. There was no error in the giving of the instructions.

In view of the serious injury to the respondent, and the many points raised by appellant, we have carefully examined the record, including the evidence, and conclude that there is no reversible error.

The judgment is affirmed.

Tyler, P. J., and Cashin, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 9, 1930, and a petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on September 8, 1930.